UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION,<br><br>    Plaintiff,<br><br>vs.<br><br>COMMONWEALTH INSURANCE COMPANY; CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON AND CERTAIN LONDON MARKET INSURANCE COMPANIES subscribing to Policy Nos. 507/N11NA08242 and GEP 2944; PARTNER REINSURANCE EUROPE plc; STEADFAST INSURANCE COMPANY; TORUS SPECIALTY INSURANCE COMPANY; and WESTPORT INSURANCE CORPORATION,<br><br>    Defendants. | Civ. Action No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

      Plaintiff National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak") brings this action against Defendants Commonwealth Insurance Company ("Commonwealth"), Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy Nos. GEP 2944 and 507/N11 NA08242 ("Lloyd's Defendants"), Partner Reinsurance Europe plc ("Partner Re"), Steadfast Insurance Company ("Steadfast"), Torus Specialty Insurance Company ("Torus") and Westport Insurance Corporation ("Westport") (collectively, "Insurance Company Defendants"), and in support thereof alleges as follows:

## PRELIMINARY STATEMENT

    1.    Amtrak was established in 1971 to operate inter-city passenger rail service throughout the United States, in place of the previous network of routes operated by private railroads.

2. Amtrak is the majority owner of the Northeast Corridor, a 457 mile railroad line running from Boston to Washington D.C. that is the most heavily-trafficked passenger railroad in North America. The Hudson River rail tunnel ("Hudson Tunnel") connects Manhattan with New Jersey along the Northeast Corridor.

3. In October 2012, Superstorm Sandy inundated the tubes of the Hudson Tunnel with millions of gallons of brackish water that degraded the tunnel itself, including the bench walls and ballasted trackbed, as well as other components and systems supporting Amtrak's operations.

4. Insurance Company Defendants are insurance companies and insurance syndicates which, in exchange for substantial premiums, sold the following first-party all-risk property insurance policies to Amtrak for the policy period of December 1, 2011 to December 1, 2012 (collectively, the "Property Insurance Policies"):

- Commonwealth, Policy No. US9434
- Torus, Policy No. 41794A111APR
- Steadfast, Policy No. IM 9805201-00
- Partner Re, Policy No. NRPC-N11 NA08246
- Lloyd's, Policy No. GEP2944
- Lloyd's, Policy No. 507/N11 NA08242
- Westport, Policy No. 31-3-74264

5. Amtrak seeks a declaration of its rights and the Insurance Company Defendants' obligations under the Property Insurance Policies' coverage extension for Demolition and Increased Cost of Construction ("DICC Extension") clauses to pay for Amtrak's costs to be incurred demolishing and replacing Hudson Tunnel elements portal-to-portal as a result of the damage caused by Superstorm Sandy. Amtrak also seeks monetary damages for Insurance Company Defendants' breach of their obligations under the Property Policies for refusing to

acknowledge coverage and/or denying coverage, in an amount to be determined at trial, but no less than $125,000,000

6.  This action is related to *National R.R. Passenger Corp. v. Arch Specialty Insurance Co.*, No. 14-cv-7510, slip op. at 6 (S.D.N.Y. Sept. 26, 2018) (the "Related Action"), in which this Court, in the course of dismissing Amtrak's claim without prejudice, invited Amtrak to renew its claim for coverage under the DICC Extension upon completion of a final Environmental Impact Statement ("Final EIS") by the Federal Railroad Authority ("FRA"), the New Jersey Transit Corporation ("NJ TRANSIT"), and the Port Authority of New York and New Jersey ("PANYNJ").

7.  Because the Final EIS was issued on Friday, May 28, 2021, when the FRA, NJ TRANSIT, and PANYNJ issued the Final EIS, Amtrak's claim for coverage under the DICC Extension is now ripe.

**PARTIES**

8.  Plaintiff National Railroad Passenger Corporation, also known as Amtrak, is a corporation organized under the Rail Passenger Services Act of 1970 and the laws of the District of Columbia, with its principal place of business at One Massachusetts Avenue, N.W., Washington, DC 20001.

9.  Upon information and belief, Defendant Commonwealth n/k/a Northbridge General Insurance Corp. is a corporation organized outside the United States with its principal place of business located outside the United States.

10.  Defendants identified herein as Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy Nos. GEP 2944 and 507/N11 NA08242 are individuals and/or entities who are or were underwriting members of Lloyd's of

London or London Market Companies that subscribed to Policy Nos. GEP 2944 and 507/N11 NA08242.  In the Related Action, the Lloyd's Defendants have previously denied knowledge or information sufficient to form a belief as to the citizenship or location of their underwriting members.

11. Upon information and belief, Defendant Partner Re is a corporation organized outside the United States, with its principal place of business located outside the United States.

12. Defendant Steadfast is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Schaumburg, Illinois.

13. Defendant Torus n/k/a StarStone Specialty Insurance Company is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois.

14. Defendant Westport is a corporation organized and existing under the laws of the State of Missouri with its principal place of business located in Overland Park, Kansas.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the matter in controversy exceeds $75,000.  This Court also has jurisdiction under 28 U.S.C. § 1349, because Amtrak is a federally-chartered corporation and more than 50 percent of its stock is owned by the United States.

16. Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims herein asserted occurred in this District, a substantial part of the property that is the subject of the action is situated in this District and Insurance Company Defendants conduct business in this District.

17.     Personal jurisdiction is proper in New York because Insurance Company Defendants agreed under the terms of the insurance contracts at issue to submit, at Amtrak's request, to the jurisdiction of a Court of competent jurisdiction within the United States. Personal jurisdiction also is proper in New York because at all relevant times, Insurance Company Defendants operated, conducted, engaged in or carried on a business or business venture in this state, there is the requisite nexus between the business and this action, and Insurance Company Defendants engage in substantial and not isolated activity within New York.

## BACKGROUND

### *The Property Insurance Policies*

18.     Amtrak purchased a substantial all-risk property insurance program covering the period from December 1, 2011 to December 1, 2012, including Insurance Company Defendants' Property Insurance Policies.

19.     All of Insurance Company Defendants' Property Insurance Policies are excess policies, which have been triggered by payment or exhaustion of the limits of the primary layers of insurance below them.

20.     Commonwealth sold an excess insurance policy to Amtrak, policy number US9434 (the "Commonwealth Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.  The Commonwealth Policy participates in a $175,000,000 layer of coverage that is excess over $125,000,000 of underlying insurance, of which its percent interest is 5.7143.  A true copy of the Commonwealth Policy is attached hereto as Exhibit 1.

21.     Lloyd's Defendants sold several insurance policies to Amtrak, including as relevant here, the excess policies numbered GEP 2944 and 507/N11 NA08242 (collectively, the

"Lloyd's Policies") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property. With respect to Policy GEP 2944, Lloyd's Defendants participate in a $175,000,000 layer of coverage that is excess over $125,000,000, of which its percent interest is 2.8571. With respect to Policy 507/N11 NA08242, Lloyd's Defendants participate in a $175,000,000 layer of coverage that is excess over $125,000,000 of underlying insurance, of which the subscribing syndicates' aggregate percent interest is 22.5001. True copies of these Lloyd's Policies are attached hereto as Exhibits 2 and 3. Policy 507/N11 NA08242 is subject to the same terms, conditions, and exclusions as more fully defined in Policy Number 084144282 issued by Lexington Insurance Company (the "Lexington Policy") on the identical subject matter and risk. A true copy of the Lexington Policy is attached hereto as Exhibit 4.

22.     Partner Re sold an excess insurance policy, policy number NRPC-N11 NA08246 (the "Partner Re Policy"), with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property and that identified Amtrak as the "Named Insured" and provided that "Loss, if any, shall be adjusted with and payable to National Railroad Passenger Corporation." The Partner Re Policy participates in a $500,000,000 layer of coverage that is excess over $125,000,000, of which its percent interest is 7.5. A true copy of the Partner Re Policy is attached hereto as Exhibit 5.

23.     Steadfast sold an excess insurance policy to Amtrak, policy number IM 9805201-00 (the "Steadfast Policy"), with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property. The Steadfast Policy participates in a $175,000,000 layer of coverage that is excess

over $125,000,000, of which its percent interest is 2.8571. A true copy of the Steadfast Policy is attached hereto as Exhibit 6.

24. Torus sold an excess insurance policy to Amtrak, policy number 41794A111 APR (the "Torus Policy"), with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property. The Torus Policy participates in a $175,000,000 layer of coverage that is excess over $125,000,000, of which its percent interest is 5.7143. A true copy of the Torus Policy is attached hereto as Exhibit 7.

25. Westport sold an excess insurance policy to Amtrak, policy number 31-3-74264 (the "Westport Policy"), with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property. The Westport Policy participates in a $500,000,000 layer of coverage that is excess over $125,000,000, of which its percent interest is 14.25. A true copy of the Westport Policy is attached hereto as Exhibit 8.

26. This table identifies each Insurance Company Defendants' coverage layer and percentage liability:

| Carrier | Policy | Layer | Participation |
|---|---|---|---|
| Commonwealth | US9434 | $175MM x $125MM | 5.7143% |
| Lloyd's | GEP2944 | $175MM x $125MM | 2.8571% |
| Lloyd's | 507/N11 NA08242 | $175MM x $125MM | 22.5001% |
| Partner Re | NRPC-N11 NA08246 | $500MM x $125MM | 7.5% |
| Steadfast | IM 9805201-00 | $175MM x $125MM | 2.8571% |
| Torus | 41794A111APR | $175MM x $125MM | 5.7143% |
| Westport | 31-3-74264 | $500MM x $125MM | 14.25% |

27. The above-referenced Property Insurance Policies generally use or adopt the same terms, conditions, and exclusions. As a result, for ease of reference, this Complaint will refer to the Commonwealth Policy.

28. The Property Insurance Policies obligate Insurance Company Defendants to cover all risks of physical loss or damage to Amtrak's interest in all real and personal property, except as specifically excluded. Amtrak's covered property includes the Hudson Tunnel.

29. The Property Insurance Policies, along with policies not at issue in this Action because they are subject to arbitration or have otherwise agreed to settlements with respect to the at-issue losses suffered by Amtrak, collectively provide coverage up to $675,000,000 for each occurrence.

*DICC Coverage*

30. Each of the Property Insurance Policies establishes a $125,000,000 sublimit for the DICC Extension. The DICC Extension provides:

> **8.  COVERAGE EXTENSIONS**
>
> **A.  Demolition and Increased Cost of Construction**
>
> In the event of loss or damage under this policy that causes the enforcement of any law, ordinance, governmental directive or standard regulating the construction, repair, use, or occupancy of property, this Company shall be liable for:
>
> (1) the cost of demolishing the undamaged property including the cost of clearing the site;
>
> (2) the proportion that the value of the undamaged part of the property bore to the value of the entire property prior to loss;

>  (3)  increased cost of repair or reconstruction of the damaged and undamaged property on the same or another site, limited to the cost that would have been incurred in order to comply with the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site.  However, this Company shall not be liable for any increased cost of construction loss unless the damaged property is actually rebuilt or replaced;
>
>  (4)  any increase in the Time Element loss arising out of the additional time required to comply with said law or ordinance.

Ex. 1, § 8.A.

31. The DICC Extension provides coverage where, as here, a policyholder is required to tear down a portion of property not damaged by an event to reconstruct the entire property up to the design needs listed in a governmental directive or any relevant standard.

### *The Ensuing Loss Provision*

32. Each of the Property Insurance Policies establishes a $125,000,000 sublimit for flood and earthquake, subject to a flood definition.  Each of the Property Insurance Policies contains the following exception to that sublimit: "Even if the peril of flood or earthquake is the predominant cause of loss or damage, any ensuing loss or damage not otherwise excluded herein shall not be subject to any sublimits or aggregates specified in this Clause B[.]"  Ex. 1, § 4.D.1.

33. The costs required under the Final EIS to perform the necessary demolition and construction of the Hudson Tunnel benchwalls, trackbed, and other components, resulting from the damage caused by Superstorm Sandy, as discussed in greater detail below, are ensuing losses or damages not otherwise excluded.

34. This means that coverage under the DICC Extension ($125,000,000) is separate and distinct from, and not limited by, flood coverage limits ($125,000,000).  The situation, as in Amtrak's case here, where a policyholder may first claim one type of coverage and then claim another type of coverage is commonly referred to as "stacking."

35. The Property Insurance Policies allow Amtrak to aggregate or "stack" multiple insurance coverages and limits.

36. Insurance companies can include anti-stacking language in their policies when seeking to prevent two (or more) coverages from being available, in sequence, but the Insurance Company Defendants did not include any such limiting language in the Property Insurance Policies.

37. The absence of any limiting language led Amtrak reasonably to expect that all limits of coverage would be available in the event of a loss.

38. The Property Insurance Policies contain a provision called "Policy Authors," which states: "Regardless of who may have drafted or prepared this policy, or any portions thereof, the provisions contained herein shall be deemed to have been authored by this Company." Ex. 1, § 38.

39. This provision is consistent with the common law of *contra proferentem,* which requires contract terms to be construed against insurance company drafters and in favor of coverage in the event of ambiguity.

### *Superstorm Sandy*

40. Superstorm Sandy made landfall on the mid-Atlantic coastal region on October 29, 2012, during the policy period of the Property Insurance Policies. A State of Emergency was declared in multiple states, including New York and New Jersey. The storm devastated the lives and livelihoods of citizens and businesses along the Eastern seaboard, causing more than $72 billion in losses. Its impact continues through today.

41. Superstorm Sandy produced a massive storm surge which inundated the Hudson Tunnel with seawater for the first time in its more than one hundred year history.

42. The Hudson Tunnel consists of two tubes, a ventilation shaft, an egress shaft and other structures. Both Hudson Tunnel tubes were inundated at mid-river above the height of the bench walls.

43. The bench walls, which are concrete and steel structures, are essential components of the Hudson tunnel. They run from portal-to-portal, providing emergency egress from trains if necessary, along with access to the full length of the Hudson Tunnel. They also house duct banks that are packed with cables, wires and other equipment, used either for the operation of trains or for the transport of communications, power and other services from one side of the river to the other.

44. This storm surge, which was unprecedented, disabled the operations of Amtrak's signal and power systems within the Hudson Tunnel and damaged various mechanical and electrical systems.

45. As the storm subsided, Amtrak commenced the complex process of dewatering the Hudson Tunnel. Ultimately, Amtrak pumped several million gallons of water out of the Hudson Tunnel. By November 1, 2012, Amtrak was able to reopen the Hudson Tunnel for partial service.

46. The inundation resulted in ongoing damage that has continued long after the Hudson Tunnel was dewatered.

47. Following inundation, chlorides remain in various components of the Hudson Tunnel, including the concrete liner, bench walls, and ballast, causing ongoing damage to those elements as well as to embedded steel, track and third rail systems, and signaling, mechanical, and electrical components.

48. While Superstorm Sandy caused extensive damage to the Hudson Tunnel, some sections of the bench walls, ballasted trackbed, and other components were not damaged.

49. Due to the nature of the damage, the age of the Hudson Tunnel, and modern standards, repairs to the Hudson Tunnel will require full replacement of both damaged and undamaged portions of the bench walls and ballasted trackbed and other components.

*Amtrak's Insurance Claim*

50. On November 2, 2012—while consumed with the aftermath of Superstorm Sandy—Amtrak gave timely notice to Insurance Company Defendants of actual and/or potential losses.

51. Amtrak has fully complied, and continues to comply, with all of the terms and requirements of the Property Insurance Policies.

52. The damage to the Hudson Tunnel is continuing.  The remedy includes the replacement of the bench walls and the track structure, which will lead to further losses.

53. Amtrak also suffered, is continuing to suffer and/or expects to suffer a variety of consequential, ensuing and other losses.

54. Amtrak's DICC Extension losses will vastly exceed $125,000,000 in connection with portal-to-portal replacement of tunnel elements due to damage caused by Superstorm Sandy.

55. Earlier disputes between Amtrak and Insurance Company Defendants resulted in prior litigation, beginning with the complaint filed in this Court on September 17, 2014 in the Related Action.

56. Although the Related Action resolved a number of disputed coverage issues, DICC Extension coverage remains in dispute.

57. The issue remains open because the Court previously ruled that the DICC Extension question was not ripe until the FRA issued its Final EIS. *National R.R. Passenger Corp. v. Arch Specialty Ins. Co.*, No. 14-cv-7510, slip op. at 6 (S.D.N.Y. Sept. 26, 2018).

58. On Friday, May 28, 2021, the FRA issued the Final EIS, as well as the Hudson Tunnel Project Record of Decision.

59. The Final EIS provides as follows:

> The most serious damage affects the concrete bench walls, which run the length of the tunnel and provide emergency egress and maintenance and first responder access to trains and track. Ducts housed inside the bench walls contain electrical wiring, utility cables, and other essential equipment, including high-voltage feeder cables that provide traction power (i.e., power for trains) for the PSNY complex. The bench walls have longitudinal cracks, severe spalls with exposed steel, and corrosion of embedded steel elements, all of which were created by or exacerbated by the seawater inundation. The continuous bench walls and duct work cannot perform reliably or be repaired. While the tunnel is structurally sound and safe for continuing passenger rail use, these conditions necessitate that the existing bench walls be replaced. These should be constructed at the proper height to meet current fire-life safety standards (National Fire Protection Association (NFPA) 130). This replacement should occur portal to portal, since it is not practical to construct the middle portion of a bench wall at different height than the two ends, given that the bench wall operates as one continuous system providing emergency egress and housing duct work inside….
>
> The damage caused by Superstorm Sandy is compounded by the tunnel's age and the intensity of its current use, resulting in frequent delays due to component failures within the tunnel. The damage to the bench walls and ballast and track systems necessitates full portal-to-portal replacement of these elements, which form integrated systems running the length of the tunnel. Moreover, both systems would need to be reconstructed to meet modern standards including fire and life safety; it would be both impractical and unsafe to reconstruct a portion of either system to a higher standard while other portions remain constructed to an older, incompatible standard.

Final EIS, Chapter 1, § 1.4.1.

60. By letter dated June 30, 2021, Amtrak renewed its claim under the DICC Extension with Insurance Company Defendants for its costs to demolish undamaged Hudson Tunnel elements and rebuild damaged and undamaged tunnel elements portal-to-portal.

61. Insurance Company Defendants have denied and/or failed to acknowledge coverage for Amtrak's claim under the DICC Extension in breach of their contractual obligations under the Property Insurance Policies.

### *A Justiciable Case and Controversy Exists Between Amtrak and Insurance Company Defendants*

62. As described above, a justiciable case and controversy exists regarding Amtrak's rights and the Insurance Company Defendants' obligations under the DICC Extension in the Property Insurance Policies to pay damages in excess of any sublimits, including but not limited to, the flood sublimit.

63. The DICC Extension applies to "loss or damage under this policy that causes the enforcement of any law, ordinance, governmental directive or standard regulating the construction, repair, use or occupancy of property."

64. The Final EIS is a "law, ordinance, governmental directive or standard regulating the construction, repair, use or occupancy" of the Hudson Tunnel, and the costs to perform the necessary demolition and construction specified in the Final EIS are covered by the DICC Extension in the Property Insurance Policies.

65. Likewise, the DICC Extension sublimit is distinct from and sits apart and above the flood sublimit.  The Property Insurance Policies do not contain any anti-stacking language or other provisions which would prohibit Amtrak from pursuing, in sequence, coverage subject to more than one sublimit.

66. As a result, Amtrak is entitled to recover $125,000,000 in DICC Extension coverage without limitation.

67. Accordingly, there is an active dispute about the meaning of these and other terms and provisions of the Property Insurance Policies for which judicial resolution is necessary and appropriate.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment)**

68. Amtrak repeats and realleges the allegations set forth in the preceding paragraphs as though fully set forth herein.

69. An actual and justiciable controversy has arisen between Amtrak and Insurance Company Defendants as to their rights and obligations under the Property Insurance Policies, including without limitation, the availability of coverage under the DICC Extension and the ability to stack flood and DICC Extension coverages.

70. Resolution of this controversy will establish Amtrak's right to recover payments up to $125,000,000 for DICC Extension coverage.

71. To date, Insurance Company Defendants have failed or refused to acknowledge their contractual obligations to pay Amtrak's covered losses under the DICC Extension in the Property Insurance Policies.

72. By reason of the foregoing, an actual, substantial and justiciable controversy exists between Amtrak and Insurance Company Defendants and a judicial declaration is necessary and appropriate so that the parties may ascertain their respective rights and obligations.

73. Amtrak seeks a judicial declaration by the Court that Amtrak is entitled to coverage under the DICC Extension in the Insurance Company Defendants' excess Property Insurance Policies for the activities specified in the Final EIS; that the flood sublimit does not apply to the DICC Extension; and resolving any other disputes over policy terms and provisions that arise in the course of this Action.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

74. Amtrak repeats and realleges the allegations set forth in the preceding paragraphs as though fully set forth herein.

75. The Property Insurance Policies are valid and enforceable contracts providing excess insurance coverage for Amtrak's losses resulting from Superstorm Sandy, including the costs of demolishing and replacing the bench walls in the Hudson Tunnel from portal-to-portal.

76. Amtrak has suffered loss to its property and that loss is covered under the terms of the Property Insurance Policies.

77. Amtrak has complied and continues to comply with all of the terms of the Property Insurance Policies, including the requirement of notice and the duty to cooperate.

78. Amtrak has submitted evidence to Insurance Company Defendants establishing more than $125,000,000 in current or anticipated losses. Insurance Company Defendants' denial and/or refusal to acknowledge that Amtrak's current or anticipated losses are covered losses under the DICC Extension of the Property Insurance Policies constitutes a breach of the terms of those policies.

79. As a direct and proximate result of the Insurance Company Defendants' breaches of their obligations under the Property Insurance Policies, Amtrak has suffered, and continues to suffer, substantial direct monetary damages in an amount to be established at trial, but not less than $125,000,000, including consequential damages, and Amtrak is also entitled to pre-judgment and post-judgment interest and costs.

80. These damages are foreseeable damages incurred by Amtrak as a direct result of Insurance Company Defendants' wrongful conduct, which were contemplated by the parties when Insurance Company Defendants sold the Property Insurance Policies to Amtrak, and

should be awarded so that Amtrak is adequately compensated for the Insurance Company Defendants' wrongful conduct.

WHEREFORE, Amtrak prays for judgment as follows:

a) A declaration that Amtrak is entitled under the Property Insurance Policies to coverage under the DICC Extension up to the $125,000,000 sublimit;

b) A declaration that the DICC Extension sublimit is separate and distinct from the flood sublimit;

c) An order finding that Insurance Company Defendants have breached the Property Insurance Policies by failing to provide or acknowledge coverage for Amtrak's claim;

d) A judgment in favor of Amtrak and against Insurance Company Defendants for the amount Amtrak is entitled to receive under the Property Insurance Policies, in an amount to be proven at trial, but no less than $125,000,000;

e) A judgment awarding Amtrak all monetary damages suffered by Amtrak caused by Insurance Company Defendants' breaches, including, without limitation, compensatory damages, consequential damages, pre-judgment interest, post-judgment interest, attorneys' fees and costs, each in amount to be proven at trial; and

f) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Amtrak demands a trial by jury on all issues so triable.

Dated: October 19, 2021                    Respectfully submitted,

**REED SMITH LLP**

By: /s/ *Richard P. Lewis, Jr.*
Courtney C.T. Horrigan, *Pro Hac Vice Pending*
chorrigan@reedsmith.com
Richard P. Lewis, Jr.
rlewis@reedsmith.com
Anthony B. Crawford
acrawford@reedsmith.com

599 Lexington Avenue, 22nd Floor
New York, NY 10022
Phone: +1 212 521 5400

David A. Ledet, *Pro Hac Vice Pending*
PA I.D. No. 323420
dledet@reedsmith.com

Reed Smith Centre
225 Fifth Avenue, Suite 1200
Pittsburgh, PA  15222
Phone: +1 412 288 3131

*Attorneys for Plaintiff*